SANBERN v. WRIGHT & COBB LIGHTERAGE CO. (two cases).

(District Court, S. D. New York.   May 28, 1909.)

Nos. 1, 2.

1. Shipping (§ 132*)—Loss of Cargo—Liability of Vessel.

Where a loss of cargo occurred through the sinking of the carrying boats and it was found that no adequate cause appeared for the sinking, *held* that the boats should be deemed to have been unseaworthy and that their owner was liable to the shipper of cargo.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 482–484; Dec. Dig. § 132.*]

2. Shipping (§ 121*)—Carriage of Goods—Loss—Seaworthiness.

The contract provided that the respondent company should furnish "good, sound, insurable" boats and look to one of the libellant companies for the loss in case of a marine disaster. *Held*, that where unseaworthy boats were supplied, the respondent company was not entitled to resort to the agreement.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 449–451; Dec. Dig. § 121.*]

3. Shipping (§ 141*)—Loss of Cargo—Limiting Liability.

A contention on the part of the respondent company that its liability should be limited to the value of the boats, not sustained because the re-

---

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

sponsible agent of the company neglected to avail himself of an opportunity to ascertain the condition of the boats.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 141.*

Limitation of owner's liability, see note to The Longfellow, 45 C. C. A. 387.]

4. SHIPPING (§ 132*)—LOSS OF CARGO—RIGHTS OF SHIPPER.
A claim by the respondent company that the libellant Trading Company was not entitled to recover because it was not the owner of the goods rejected, it being held that the Trading Company having obtained possession of them, with the right to sell and collect the proceeds, was entitled to bring the action here.

[Ed. Note.—For other cases, see Shipping, Dec. Dig. § 132.*]

(Syllabus by the Judge.)

Kneeland & Harison, for libellant.
Wray & Callaghan, for respondent.

ADAMS, District Judge. The first of the above entitled actions was brought by Albert W. Sanbern, the assignee of the New York Glucose Company, and of the General Trading Company, to recover the damages caused by the loss of 250 barrels of glucose and of 380 bags, 400 boxes and 50 barrels of starch, the result of the capsizing of the lighter Star, owned by the respondent, on the 12th day of September, 1905, while being towed from Edgewater, New Jersey, to Pier 21, North River. The fault alleged by the libellant was the defective and unseaworthy condition of the lighter. The losses were said to have amounted respectively to $3,387.38 and $1,667.49, amounting altogether to $5,054.87. After various admissions and denials, the respondent alleged:

"Further answering said libel, respondent alleges:

Seventh: That on September 12th, 1905, at about 2 o'clock A. M., the steam lighter 'Leonard J. Busby' took said lighter 'Star' in tow at Edgewater, N. J., as aforesaid, alongside on her starboard side, and, at the same time, took another barge in tow alongside on the port side. The tide was highwater slack at the time and rain was falling, with little or no wind. After leaving Edgewater, N. J., the wind blew from the southeast and when said steam-lighter, with her tow, reached a point about off Pier 50, North River, the wind increased to a gale and the sea became rough. About in this neighborhood said tug and tow ran into floating débris in the river, consisting of logs, spiles and other timber. The said steam-lighter slackened her speed more than once in order to prevent damage to her said tow, and proceeded cautiously for her destination. Shortly afterward it was discovered that said lighter 'Star' was making water very fast. Her pump was set to work and was worked continuously but the water continued to gain. The said lighter's pump was worked continuously and said steam-lighter continued with said tow. When said steam-lighter and tow reached a point about abreast of Pier 23 and were preparing to land said barge 'Star' at Pier 21, said barge, without any warning, or premonition, listed over to port, dumped her cargo and then turned bottom side up. Those on said steam-lighter cut loose from said lighter 'Star' and landed the remainder of her tow and returned to get the 'Star,' but it was found that she had drifted into Pier 21, North River. She was thereafter righted and towed to a dry dock.

That at the time said lighter 'Star' left Edgewater, N. J., she was tight, staunch and strong and seaworthy, properly manned, fitted and equipped and

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that said disaster was not caused through any fault or negligence on the part of the respondent, its servants or employés.

Further answering said libel, and as a separate defense, respondent alleges:

Eighth: That on or about the 5th day of February, 1903, your respondent and the New York Glucose Company, above mentioned, entered into a contract in writing whereby it was, among other things, agreed that the respondent should lighter the output of the factory of said New York Glucose Company at Shadyside, N. J., upon the terms and conditions in said agreement named. That said agreement was in full force and effect at all the times mentioned in the libel herein and thereafter. That said cargo so taken aboard said lighter 'Star,' as aforesaid, was shipped by said New York Glucose Company and received by respondent for lighterage pursuant to, and in compliance with the terms and conditions of said agreement, and not otherwise. That said agreement contained the following clause:

'It is further understood that we are to give and take receipts at both points of loading and unloading, and any discrepancies in quantities, in case of shortage as taken on board and as delivered, to be paid for by us, except in the event of a loss or damage by fire or marine disaster, in which case your company would look for compensation to the underwriters who might have insured the cargo; it being understood that your company will effect the insurance on all cargoes lightered, yourselves, and that the lighterage company shall not be held responsible in any way should such an accident chance to occur.'

Ninth: That all of said cargo was delivered to respondent and shipped by said New York Glucose Company, and by no other person. That the damage to said cargo, set forth in the libel herein, was caused by a marine disaster, and that said loss and damage came within the terms of said agreement between said New York Glucose Company and respondent; that by reason of the premises, respondent was not liable for any loss of or damage to said cargo.

Respondent further answering the libel herein, and for a further and separate defense, alleges:

Tenth: That respondent is the owner of said lighter 'Star'; that said lighter was tight, staunch and strong and seaworthy, properly manned, tackled, apparelled and equipped at the time she started upon said voyage; that said damage, sinking and loss occurred without the privity or knowledge of respondent, and if respondent shall be held responsible for said damage, sinking and loss, or any part thereof, by reason of the acts or things done or omitted by those in charge of its said property, respondent prays leave to limit its liability herein to the value of said lighter 'Star,' her tackle, etc., at the time of said sinking, as she then lay, and her pending freight, which value and pending freight amounted to nothing whatever.

Respondent therefore claims the benefit of sections 4283 and 4284 of the Revised Statutes of the United States, and the acts amendatory thereof and supplemental thereto and of all other acts limiting the liability of shipowners."

The second of the actions was also brought by Sanbern, as assignee of the same companies, to recover the damages, caused to his assignors, by the sinking of the lighter Eagle, owned by the respondent, at Pier 49, North River, on the 31st of December, 1905, and the consequent injury to 7 barrels of glucose and 16 barrels of grape sugar, a part of 100 barrels of the former and of 70 barrels of the latter, the property of the Glucose Company, and a part of 14 barrels and 50 bags of starch, and of 150 bags of dextrine, the property of the Trading Company and for injury to the remainder of the shipment. The losses were said to have amounted respectively to $1,287.14 and $1,213.58, altogether to $2,500.72. The fault alleged by the libellant was the defective and unseaworthy condition of the said lighter.

After various admissions and denials, the respondent alleged:

"Further answering said libel, respondent alleges:

Seventh: That said barge 'Eagle' was made fast to the South side of the pier at 49th Street, on the last of the flood tide, lying with her starboard side next to the dock; that when she was so made fast, said lighter was tight, staunch and strong and seaworthy, and that she rested properly and floated easily, and her cargo was so placed on board thereof as to properly trim said lighter; that as the tide receded said lighter settled upon some sunken object in such manner as to break in one of her planks near the bottom of said lighter, and she immediately filled and sank before anything could be done to prevent it.

That said disaster was not caused through any fault or neglect on the part of the respondent, its servants or employés, but happened through some cause unknown to respondent, other than as above set forth.

Further answering said libel, and as a separate defense, respondent alleges:"

Eighth and Ninth: These are as pleaded in eighth and ninth paragraphs of the separate defense of the Star, supra, and need not be repeated.

"Respondent further answering the libel herein, and for a further and separate defense, alleges:

Tenth: That respondent is the owner of said lighter 'Eagle'; that said lighter was tight, staunch and strong and seaworthy, properly manned, tackled, apparelled and equipped at the time she started upon said voyage; that said damage, sinking and loss occurred without the privity or knowledge of respondent, and if respondent shall be held responsible for said damage, sinking and loss, or any part thereof, by reason of the acts or things done or omitted by those in charge of its said property, respondent prays leave to limit its liability herein to the value of said lighter 'Eagle,' her tackle, etc., at the time of said sinking, as she then lay, with her pending freight, which value with such pending freight amounted to the sum of Three Hundred ($300) Dollars and no more.

Respondent therefore claims the benefit of sections 4283 and 4284 of the Revised Statutes of the United States, and the acts amendatory thereof and supplemental thereto and of all other acts limiting the liability of ship-owners."

The actions were tried together, as some portions of the testimony apply to both.

The disaster to the Star occurred while she was making a voyage to Pier 21, North River. She was found to be leaking badly and taking in more water than her pumps could control and she capsized and dumped her cargo shortly before reaching her destination.

The seaworthiness of the vessel is first in controversy. The Star was about 120 feet long by 21.6 beam and drew between 6 and 7 feet. She was one of a number of boats bought by the Lighterage Company in Baltimore about 1899 or 1900, when it was testified $12,000 or $14,000 were paid for five boats of the same general character though differing in size. They were all of about the same age, though what that was did not definitely appear. Respondent's witness Rennie, an inspector for underwriters, said he found her upon examination in 1904 for insurance "in a fair condition for a boat of her age" and insurable; that he inspected her again in 1905 and found her in a condition "safe enough to pass." On the cross, he said he had no idea how old the boats were. "They were not very old boats. They were what I considered up in years but not dead old, not a very old boat. * * * A boat gets an old boat after she is 25 years of age; and up to 40 or 50 that is a very old boat."

When the boats were purchased about $402 were spent upon the Star in rebuilding her, but what it consisted of does not appear. After that it is not shown specifically what was done to her. The Lighterage Company had a yard at Staten Island, where they overhauled these boats as far as the water line and did repairing. It was said that if boats were found to be leaking, they were sent to the dry dock but if not leaking, no money was spent on them. The dry dock proprietor could not give any particulars but remembered that the boat had been at his yard at some time. After the Star was capsized she was left by her tug and not found again until the next morning. In the meantime, she had been collided with and so damaged that she was beyond repair.

The only witness called to explain the disaster to the Star was the master of the tug who had her in charge during the trip. At the time of the trial he was a deck hand on municipal ferry boats. He explained the trouble as follows:

"Q. Did anything happen on the way down to the vessel? A. I started down the river with the two alongside; it was about slack water when I left up there, and the tide started running ebb; the wind was blowing southwest and blowed up a little sea, going down river it blowed up pretty well and got so rough every once in a while I had to slow down, to slack up. Going down I noticed a lot of débris floating in the river—it looked like logs to me, broken stuff—generally there is after slack water, you see some of that floating through the middle of the river, and I had to slow down a couple of times for that. I got down to Pier 50, North River, the Wilson Line, and the captain came up and told me the boat was taking in water; I asked him if he could hold her until we got down to Pier 21, I told him I couldn't put my siphon in or do anything out there in the river being the sea was so rough; he said, 'I think we can hold her,' and I kept going on down as fast as I could. I got off Pier 21 rounding to to get in there and she started to turn over on top of me, to run over towards the tug; I see she was dumping her load and I told them to cut her adrift and she turned bottom side up."

No cause for the disaster beyond the foregoing was shown and it is not probable that the boat encountered any marine peril to which the loss could be attributed. Taking her age and general condition into consideration, I think the loss was due to inherent weakness of the boat. She should have been strong enough to withstand the ordinary perils of the river.

The disaster to the Eagle, a smaller boat than the Star, occurred while she was lying on the south side of the pier at 49th street, North River, on December 31, 1905. She also had been towed from Edgewater, which she left at 1 A. M., and there was no water in her when she landed at 49th Street. The master had made her fast at high water slack and first observed that she was leaking about a half of an hour later, 2:30 o'clock, when he heard a sound of water coming in and went below. She filled without sinking but turned on her side and dumped her load, which was on deck. After the accident, it was discovered that she had a broken plank in her stern on the starboard side, well aft, which was sufficiently large to let in water enough to sink her. There is no explanation of how this hole was made and nothing can properly be attributed to it as a cause of sinking. As far as appears, it may have occurred just as well after the boat filled as before. Some corroboration of the libellant's contention to the former effect

is found in the testimony that the breaks were outward rather than inward, indicating an internal cause of the sinking.

The Eagle was bought at the same time as the Star and $923.79 spent in repairing her. Much of what has been said with respect to the earlier history of the Star applies to her càse.

Captain Salter, an experienced marine insurance inspector, said with respect to the Eagle:

"Q. Did you look over the boat with him? A. Mackenzie took the lead and I followed him; we surveyed the boat outside first, externally, and hunted for the so-called cause of her sinking, to see if we could find any place in her bottom or sides where she had had any collision or where anything had struck her. There was a plank found under the starboard counter pretty well up, I believe about 18 or 20 inches long according to my recollection, that was very badly decayed; it had broken at the butt and started up which would indicate it had been forced out by the water; and I found the plank defective, in other words rotten.

Q. Started out or started in? A. Started out; that would be natural from the water forcing itself out after she got on the dock.

Q. What else did you find? A. On examining the planks of the boat outside I specially noticed there were quite a number of butts on one frame; it is something that I would be attracted to very quickly because as a rule it is not considered the proper method of planking a boat, to have more than one butt with two planks between them and then a butt, on a frame, but frequently in patching these old boats they don't put a long plank in all between the butts. My recollection is there were four butts in this one frame on the starboard side, four planks coming each way on the one frame, and the same on the other side.

Q. And no break in the butts? A. There was no planks between them, no. * * *

By the Court: Q. Did anything indicate to you that she had come into collision with anything? A. Nothing, your honor. That is what we looked for because that would not be an uncommon occurrence but we could not find it, that is exactly what I looked for.

Q. You say this wound would not indicate a collision? A. I didn't think so, no sir."

He also said that Mr. Mackenzie, the other surveyor, threw up his hands at the time of the survey and said: "Here is another case of a worn-out boat, Salter." Mr. Mackenzie, a witness for the respondent, did not deny this. Mr. Salter said that he considered the boat unseaworthy.

The loss here also appears to have been due to an inherent weakness of the vessel.

It was agreed in some letters which passed between the Lighterage Company and the Glucose Company in February, 1903, when provisions for the lighterage of the latter's goods were made, that in case of loss or damage by marine disaster, that the Glucose Company would look to the underwriters for compensation, to the exclusion of the Lighterage Company, and that agreement is urged in the relief of the respondent. If the accident had happened through some perils of the seas, perhaps the contract would apply, but it was agreed between the parties, by correspondence dated February 5, 1903, that the respondent was to furnish "good, sound, insurable barges or boats." The losses occurred because this undertaking was not complied with and I do not consider that the Lighterage Company is in a situation to resort to the undertaking.

It is urged that the respondent if liable by reason of the condition of the vessels, is entitled to limit its liability to their value, which would relieve it altogether as far as the Star was concerned, because she was a total loss, and to the extent of $300 in the case of the Eagle, that having been her value, according to stipulation, if the court should find that the respondent was entitled to limit its liability. The determination of the question depends upon which of the respondent's officers or agents knew or should have known of the condition of the vessels and what he did to inform himself thereof. The president of the respondent was not able to testify to their condition because he did not keep himself familiar with it. He said that Mr. Mulvaney was general superintendent of such affairs and was expected to see that the boats were kept in good condition. There can be little doubt that Mulvaney was the one to whom the condition of the vessels should have been known. The Republic, 61 Fed. 109, 113, 9 C. C. A. 386. His testimony discloses that he performed the duty of inspection in a very perfunctory manner. He said in testifying about the Eagle, that they did "whatsoever had to be done; if the boat leaked in the bottom we put her on the dock and tended to it; if she wasn't leaking we didn't spend any money." That is, it was left to the progress of decay to develop signs of weakness. Substantially the same was said with respect to the Star. I can not regard such a method as a proper one in the performance of the duties of inspection, the burden of showing which was upon the vessel's owner. The Colima (D. C.) 82 Fed. 665, 679.

The respondent claims that no title to the property was shown in the General Trading Company and it has therefore no right to recover under any circumstances. It appears that the goods claimed by it were shipped by that company to which they were given by the Glucose Company to sell. The proceeds were collected by the Trading Company, which accounted to the Glucose Company. The former was the proper party to sue by virtue of its interest in the property and even if it had been merely a factor still it was entitled to possession and to maintain the action.

There will be decrees for the libellant, with orders of reference.