## THE MARGUERITE.

## THE FLORENCE J.

**LAKEHEAD TRANSP. CO., Limited, et al. v. KEWAUNEE, G. B. & W. R. CO. et al.**

No. 8350.

Circuit Court of Appeals, Seventh Circuit.
Feb. 2, 1944.
Rehearing Denied March 17, 1944.

492

Robert Branand, Jr., of Chicago, Ill., and Emmett Horan, Jr., of Milwaukee, Wis., for appellants.

Walter T. Bie and Jerome R. North, both of Green Bay, Wis., Clyde E. Shorey, of Chicago, Ill., and John F. Baker, of Milwaukee, Wis., for appellees.

Before EVANS, SPARKS, and MAJOR, Circuit Judges.

EVANS, Circuit Judge.

This appeal is from a decree entered in an admiralty suit. Two questions are raised: (a) Appellants' urge that they are entitled under the law to exoneration from, or a limitation of, liability for damages to the railroad bridge across the Fox River at Green Bay, Wisconsin, which occurred when their barge collided with the bridge. The appellees are the joint owners of this bridge, and they, in addition to opposing the prayer of appellants' petition, sought by their answer to recover from the appellants, damages which they suffered as the result of the collision. (b) The sufficiency of appellants' fact showing to bring them within the exception to the rule which limits liability to the value of the vessel which caused the damage. One question may be called a legal,—the other a factual issue.

The District Court denied the relief sought by the appellants,—that is, denied them exoneration from all liability, and also refused to limit their liability to the value of their barge. It entered a decree in favor of each appellee for the amount each suffered because of the damage to their bridge, to-wit: $58,956.70 and costs, in favor of Kewaunee, Green Bay and Western Railroad Company, and $44,086.30 and costs in favor of the Trustee of the Chicago and North Western Railway Company.

Our determination of the controverted question turns on the application of the exception to the rule limiting the liability of the owner of a vessel, which is found in Sec. 183(a), 46 U.S.C.A. Striking out the words of no materiality in this case and underlining the important clause the section reads:

"The liability of the owner of any vessel, whether American or foreign, for any * * * loss, damage * * *, done, occasioned, or incurred, *without the privity or knowledge of such owner or owners,* shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending." (Italics ours)

Specifically the words of controlling weight are: *"without the privity or knowledge of such owner or owners."*

The law is clear that not only must the accused vessel be at fault, but the owners must have known of the fault, which actually contributed to the accident and resulting damage, before full damages can be recovered. Equally well settled is the rule that the owners of the vessel who seek a limitation of liability, to the value of the vessel, carry the burden of taking themselves outside the exception. The burden is on them to show they were "without the privity or knowledge." Petition of Sinclair Navigation Co., D.C., 27 F.2d 606; The Silver Palm, 9 Cir., 94 F.2d 776; In re Reichert Towing Line, 2 Cir., 251 F. 214.

This narrowed inquiry naturally invites consideration of the three more specific, determinative questions: (a) What constitutes knowledge? (b) Who are authorized to bind the owners of the vessel with knowledge by them possessed? (c) Does the evidence show that one authorized to bind appellants knew of, participated in, or caused the negligent action which resulted in the barge's collision with the bridge?

Answering the second question first, it is clear that knowledge will not be imputed to owners of a vessel unless such knowledge is by one who can bind his principal. The owners of the vessel are generally far removed from the scene of the accident, and an ordinary sailor, for example, may have acquired knowledge of a defect in the vessel's equipment during the voyage, and it may further appear that the defect ultimately resulted in the damages complained of, yet his knowledge would not be imputed to the owners so as to make them liable for the entire loss, irrespective of the value of the vessel.

As stated in The Oneida, 2 Cir., 282 F. 238, 241, and again in The 84-H, 2 Cir., 296 F. 427, 431:

"The privity or knowledge must be actual and not merely constructive. It involves a

personal participation of the owner in some fault or act of negligence causing or contributing to the injury suffered. There must be some fault or negligence on his part or in which he in some way participates."

Numerous cases are cited by appellants which hold that upon the facts disclosed in those cases the owners did not have such privity or knowledge as to bring them within the exception of the statute. In these cases a limitation of liability was decreed. The Admiral Fiske, 9 Cir., 41 F.2d 718; The North Star, D. C., 3 F.2d 1010; The Princess Sophia, 9 Cir., 61 F.2d 339; The Marie Palmer, D.C., 191 F. 79; The Francesca, D.C., 19 F.Supp. 829.

■■ While it is apparent that privity and knowledge, as these terms are used in the statute, must necessarily be determined by the facts of each particular case (Coryell v. Phipps, 317 U.S. 406, 63 S.Ct. 291), it is clear that where the owner is a corporation, knowledge or privity of its managing officer is usually its knowledge. This would include anyone to whom the corporation has committed the general management or general superintendency of the whole, or a particular part of its business. Craig v. Continental Ins. Co., 141 U.S. 638, 12 S.Ct. 97, 35 L.Ed. 886; The Erie Lighter, D.C., 250 F. 490; Spencer Kellogg & Sons, Inc., v. Hicks, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903; In re Spencer Kellogg & Sons, 2 Cir., 52 F.2d 129. In the latter case the court said:

"The fault must be of an officer high enough in control to charge the company personally."

Applying the foregoing tests, we conclude that the District Court's conclusion "that the occurrence was with the privity and knowledge of the petitioners" is supported by substantial evidence.

■ The trial court made the following findings, which have evidentiary support:

"11. Captain L. H. Shaw was on the Hurlbut Coal dock in Green Bay on September 17, 1940, when the tug 'Marguerite W' and the barge 'Florence J' left the dock and knew or should have known, the length of the towline which was used. He had full knowledge of the practice and custom of taking the barge through the draw without the assistance of the harbor tug with a sternline to the barge. He knew the harbor tug was available and knew, or should have known, that prudent seamanship required the use of the harbor tug with a sternline to the barge.

"12. That fault and negligence were committed in the navigation of the tug 'Marguerite W' and the barge 'Florence J' in consequence of which said barge collided with the bridge jointly owned by said Kewaunee, Green Bay and Western Railroad Company and Charles M. Thomson, Trustee of the Chicago and North Western Railway Company, and that the said occurrence was with the privity and knowledge of the petitioners."

The following facts support these findings:

Petitioner, Lakehead Transportation Co., Limited, was a corporation organized under the laws of Canada, with its principal place of business in Fort William, Ontario, from which place it operated a fleet of vessels engaged in transporting and hauling pulpwood to Green Bay, Wisconsin. It owned the barge "Florence J." Its practice was to have a representative in Green Bay during the navigation season. Prior to 1939, a director of the corporation represented it at Green Bay during the navigation season. He held the title of Shore Captain. Beginning that year, Captain L. H. Shaw acted as petitioners' representative in Green Bay and also bore the title of Shore Captain. He handled the business of the Lakehead Transportation Co. at Green Bay and when away he conducted it by mail. He looked after and kept up the vessels. He superintended the loading and unloading of pulpwood. He bought the fuel and looked after its loading and arranged for dock space. He settled claims. Applications for positions as masters and engineers on the barges were submitted to him, and he made recommendations for their hiring. He notified the captains and engineers when to report. He was also at the time of the accident, treasurer of petitioner, although it appeared there was another secretary and treasurer and Shaw merely was given the title of treasurer so he could thereby board the vessel before the arrival of the customs officers, which he could not have otherwise done.

This brings us to the final question,— Was there negligence on the part of appellants of which Shaw had knowledge? The answer to this query calls for a further study of the evidence.

Appellants in the original petition contended that there was no negligence in the

operation of the tug or by those in charge of the barge. They also argue that even if the tug's operations were faulty, the owners of the barge would still be entitled to limit their liability to the value of the barge.

We unhesitatingly reject the argument that there was no negligence by anyone.

The Facts. The Fox River flows northeast through Green Bay and empties into the bay of the same name just beyond the north limits of the city. It is a sizeable river, wide and deep enough at its mouth to accommodate any lake steamer. The most northerly bridge across it is known as the Kewaunee, Green Bay and Western and extends easterly and westerly across the river at a slight angle. It is a swing bridge and the draw span is 230 feet. A protection pier on the center of which the center of the draw span rests, is 300 feet long extending from southwest to northeast and parallels the banks of the river.

The East River, a smaller stream, flows into the Fox River, about four to five hundred feet south of the bridge. Weather, wind, and current conditions are all well known. On the day in question there was a moderate wind from the south. No unusual weather conditions prevailed. There had been no increase in flow of water due to rain, nor had there been a strong wind from the north which caused the water to back up into either the Fox or East Rivers. The current was moderate, one or two miles per hour.

The tug "Marguerite W" was a seagoing tug, 120 feet long, used to tow barges loaded with pulpwood from the Lake Superior Country to Green Bay. There was evidence showing it was not a harbor tug and could not be well maneuvered for harbor work. In the Green Bay harbor there was a harbor tug "Reiss" owned by a coal company. This tug was shorter and turned in its length, to-wit, 71 feet.

On the day of the accident, the tug and the barge started from the dock together. The barge "Florence J" was 352 feet long, 30 feet above the water's edge, and when light, drew four feet of water. She was moored at the Hurlbut dock when the tug pulled her out into the stream. Captain Shaw was on the dock in his managerial capacity. There was no interference of any kind by any third agency. Both the Florence J and the Marguerite W seemingly floated down the river, moved by the current, the barge being almost parallel to the tug. The bridge tender threw the draw open. The barge came within 75 feet of the pier and on its own momentum headed straight for the pier, hit it, and the damage was done. It dropped its anchor and came to rest south and near the east approach of the bridge.

It would be difficult for any reasonable person to conclude that with the draw open and with plenty of room for the vessel to go through, no inference of negligence could be legitimately drawn from the barge's striking the pier. While not quite comparable, it might be argued that no negligence was inferable from an automobile running over a sidewalk into and through the window of a retail store. A loss, or lack, of control in either case is the inescapable deduction.

It is hard, if not impossible, to explain the accident on any theory other than that of negligent operation of either the barge or the tug or both. They floated down the river together, and notwithstanding there was room for the barge to go through without striking shore or pier, it ran directly into the pier.

The more specific evidence clearly confirms the general deduction of negligent operation. There was nothing done. The barge was supposed to be controlled by the tug. The towline which ran from the barge to the tug was so long that the tug could do nothing. Too much rope has accounted for many unhappy consequences in a wide field of human activity. Here it resulted in failure or inability of the tug to control the course or direction of the barge.

The trial court found: (a) The towline was too long for safe operation under the conditions present. (b) Prudent seamanship required a course farther to the east than that taken by the master of the tug. (c) The master and crew of the barge did not make effective use of its rudder. (d) The masters and crews of both the barge and the tug were negligent in not discovering earlier the course of the barge so that signals might have been exchanged and corrective measures taken. (e) Failure to use the harbor tug with a sternline to the barge.

Surely the court was justified in finding that the towline was too long and that Captain Shaw knew of the length of the towline on the barge when it left the dock whereon he was standing started on its

ill-fated trip down the river. Shaw, too, knew that there was a harbor tug available. It seems self-evident that had another tug been connected to the stern of the barge, it could have been moved to the east as it floated down the channel and thus have avoided the pier. Two of the negligent acts, namely, failure to use a second tug and the excessive length of the towline, in view of the use of but one tug, were chargeable to Shaw and therefore to appellants. Not only must we charge Shaw with knowledge of these two things, but he and his superior must be charged with direct responsibility for both of them.

Appellants strenuously argue that a second tug was not needed, nor was it usual or customary, and they should be not held to a stricter or a higher degree of care than was customary or common practice in this area of navigation. We think the conclusion unavoidable that either two tugs were necessary, or the towline should have been shorter so that the tug could have controlled the course of the barge.

Whether an extra tug should have been used cannot be determined on the basis of any rule, but must depend upon the facts in each individual case. Here it is apparent that one tug could not and did not handle the course of the barge with the existing towline equipment. The testimony shows the tug was helpless and wholly unable to handle the situation. A smaller tug with a towline attached to the stern of the barge would have avoided the accident. At least, the trial court was justified in so finding.

 We are, of course, not required to accept either the fact findings or the conclusions of the District Court. But where that court sees and hears the evidence, we are not disposed to ignore its findings. In fact, it is quite impossible to not be affected by them. While Admiralty Rule 46½, 28 U.S.C.A. following section 723, does not define the conclusiveness of findings of the District Court, we are satis-fied that it should be read in the light of, and construed consistently with, Rule 52 of the Rules of Civil Procedure, 28 U.S.C.A. following section 723c. We have no hesitancy in holding that weight and defer- ence should be given to the findings of any official or public tribunal, be it a court or any other fact-finding body, which has the advantage of seeing and hearing the witnesses who give the testimony from which findings of fact must be made. There is, of course, no reason nor justification for the appellate court's carrying this rule to the point where it abrogates or surrenders its function or obligation to review the findings of the lower court or administrative body (or jury) and uses the rule to hide behind or to avoid a plain duty which is its to exercise. We think it our plain duty to the party who appropriately and timely challenges the sufficiency of the evidence to support the verdict, finding or judgment, to study the evidence and for ourselves investigate the weight of the evidence which the fact-finding body believed to be the facts back of the dispute or controversy.

This duty we have attempted to perform in this case. Proctor for petitioners has persuasively argued that there was no negligence of which Shaw had knowledge, or was attributable to him, and was attributable to the barge, which we can say caused the collision. We think otherwise. Certainly, if a second tug were necessary, or if ordinary care dictated the employment of a second, a harbor tug, Shaw and therefore petitioners must be charged with the duty to get one. The collision itself, and the helplessness of the big tug, and the long—too long—towline with which the barge was equipped all unite to support the findings above referred to, which Judge Duffy made.

From a study of the entire evidence, we are convinced that the trial court was justified in making the specific findings of negligence which it made.

The decree is affirmed.