**GREAT ATLANTIC & PACIFIC TEA CO.**
**v. Lloyd BRASILEIRO.**

No. 143, Docket 20427.

Circuit Court of Appeals, Second Circuit.

Feb. 3, 1947.

Before L. HAND, SWAN, and CLARK, Circuit Judges.

Henry N. Longley and Bigham, Englar, Jones & Houston, all of New York City (John W. R. Zisgen, of New York City, of counsel), for appellant.

Frank J. McConnell and Purrington & McConnell, all of New York City (James D. Brown, of New York City, of counsel), for petitioner Lloyd Brasileiro.

L. HAND, Circuit Judge.

These appeals are from a decree in a proceeding by a shipowner to limit its liability for damage by fire and water to the cargo of the ship, "Pocone." As the total claims are less than the conceded value of the ship, no question of limitation arises; and the first and chief issue is of the own-

er's liability under the fire statute:[1] that is to say, whether the fire was "caused by its design or neglect." A second and subsidiary issue is of the owner's liability for water damage, but, as will appear, this it will be unnecessary to decide. The facts, substantially as the judge found them, are as follows. In November and December, 1941, the "Pocone" lifted a cargo in Brazilian ports, consisting for the most part of coffee and castor beans. Her last port of call was Victoria, Brazil, from which she cleared on December 9th; but she put in at Recife for bunkers on the 13th and finally broke ground bound for New York on the 14th. She had been designed with a cross or thwartship bunker forward of the boiler room; but, because coal was scarce in Brazil, before she left the United States she also filled her "Reserve Bunker," which was the space just forward of the cross bunker, connected with the boiler room by a tunnel passing through the cross bunker. Before she began to lade any of her return cargo, the "Reserve Bunker," the coal from which had been burned on the voyage south, was thoroughly cleaned and made ready as stowage space; and, when she left Victoria, 8500 bags of castor beans in burlap were stowed in it. These bags reached up to the 'tween-decks above—about twenty-one feet—and filled the hold thwartships and fore and aft except for a space of about eight inches between the after end of the stow and the after bulkhead. The judge found that, through the working of the ship during the voyage, the stow had slipped so that some, if not all, of the after bags were either in actual contact with, or very close to, the after bulkhead. On the 19th—five days after the ship left Recife— the coal in the port cross bunker began to give off fumes and heat; but this quickly disappeared after the crew played water over the surface, and nothing further untoward happened until the 28th, when again the coal in the port cross bunker was found to have heated. By the afternoon of that day flames appeared on its surface, and although the crew intermittently wet it down, this fire continued to break out, and by the afternoon of the 29th, had extended to the starboard cross bunker. Flames played upon the surface after the ship berthed at her pier in Brooklyn at noon on the 30th, and until midnight of that day. The court concluded that below the surface the coal "must have been highly heated if not incandescent from December 28th to midnight of December 30th," and we accept the finding as an inescapable inference. The ship began to take out the coal which remained in the cross bunker on the afternoon of the 30th; and what was taken out had been so wetted that, although it was steaming, it neither flamed, nor was incandescent. By midnight on the 31st the bunker was substantially empty, the limber boards were exposed and so was the forward bulkhead. The limber boards over the port bilge, from the forward bulkhead aft nearly the whole length of the bunker had been burned; also a hole had been burned through the bottom of a wooden casing which protected a sounding pipe that ran down the side of the forward bulkhead to the port bilge. This casing was made up of three wooden sides which surrounded the sounding pipe, and after the fire at the bottom had burned the hole the casing apparently acted as a chimney, because, although the outside of the boards above the hole was not burned, on the inside about a third of their thickness had been charred away. For a distance of some five feet that part of the bulkhead, along which the pipe ran, had been warped; and this the court found was because of the flames within the casing.

The owner's general agent in New York was in Washington, and his duties devolved upon one, Zumsteg, its "traffic manager," who handled the movements of cargoes, set the schedules of the ship, made arrangements for lading and discharge, and oversaw all operations at the pier. Under him was a man named Borges, the "port engineer," whose duties were to board vessels on their arrival, to make all requisitions for repairs and arrangements with the shipyard, if necessary, and whose words, so far as engineering and technical matters were concerned, was final. As was his duty, Borges boarded the ship on the afternoon of the

---

[1] Title 46 U.S.C.A. § 182.

30th and talked with the master who told him that there had been a small fire in the coal for a couple of days. Thereupon Borges went below to the fire room with the master and engineer, and from there he went into the cross bunker, which was lighted, and walked over the coal and looked about; although, as we have said, there were intermittent flames on the surface until midnight of that day, apparently there chanced to be none while Borges was there, and the bunker looked normal. It was Borges who directed that a shore gang should relieve the crew on the morning of the 31st in clearing out the coal; but whether the work continued during the night of the 30th does not appear.

Castor beans are made up of a greasy pulp inside a shell, and the shell is apt to be crushed when the bags are stowed, in which event the oil spills out and stains the bags. About seven-thirty on the morning of January first fire broke out in the castor beans stowed in the "Reserve Bunker," whence it spread to the No. 3 'tween-decks above. Shortly thereafter the fire was reported to the master who ordered the hatch covers to be taken off No. 3 main deck hatch and from the hatch which led from the 'tween-deck to the "Reserve Bunker." The fire hose was connected up and water was poured into that bunker for fifteen or twenty minutes, but, as this proved ineffectual, a fire alarm was turned in, which the city fire department answered. Number 3 hold and 'tween-deck and No. 2 hold and 'tween-deck were flooded and eventually the ship was sunk at her pier. The cargo in both the forward and after holds was damaged by water, which made up most of the loss.

The judge found that the master and crew had been negligent in not recognizing the danger that the fire in cross bunkers might ignite the castor beans. It would have been a simple and practical operation, he thought, to discharge the cargo in the forward square of the hatch of No. 3 'tween-deck and then discharge all the cargo in the "Reserve Bunker," and that ought to have been done before the morning of the first. He found that it was the fire and heat in the cross bunker which had in fact caused the fire in the "Reserve Bunker," and that the bags had been charring and heating for a number of days before they actually caught fire. On the other hand he refused to impute any personal fault or negligence to Borges or Zumsteg, whom he found to have been justified in believing when the "Pocone" had docked that the fire was under control and did not endanger the cargo stowed in the "Reserve Bunker." He found, however, that the ship's bulkheads were unseaworthy, and for this reason he held the owner liable for water damage in No. 2 hold and 'tween-decks, in holds Nos. 4 and 5, and elsewhere; and he held that the fire damage, from which he had exonerated the ship, was a proper item for general average.

We will assume that the fire on the 19th, had that been all, was too inconsiderable to cause any apprehension by the time the ship docked on the 30th: it was then more than ten days old, and if it had been permanently quenched at once, only an over anxious master would have taken precautions against it. But it had not been quenched; after nine days it broke out again, and this time it proved much less manageable; although constantly wet by the ship's hoses even the flames had not been put out when the ship finally docked, or for twelve hours afterwards. No doubt it was not possible to know just what parts of the coal had been burning until the bunker was cleared; but that very fact called, not only for examination, but for immediate examination. A careful master who knew that his coal had been steadily burning for two days would have begun at once to ascertain the conditions in a bunker which was in direct contact with a hold containing such an inflammable cargo. Any master, who did not, was chargeable with what he would have discovered as of the time when with the proper expedition he could have cleared the bunker. That was substantially earlier than midnight of the 31st. Had he done so, he would have seen that the fire had spread all over the bottom of the coal, had burned the limber boards, had burned a hole at the bottom of the casing which had acted as a chimney, and that the flames had warped the exposed

bulkhead. The fact that the ship's witnesses saw none of this, instead of excusing them, is eloquent evidence of how superficial they were. Nor will the argument stand scrutiny that it was not heat but the later swelling of the beans which warped the bulkhead. The area was not the least like a bulge which a swollen cargo could make; it was in the exact path of the flames, five feet long and only eighteen inches wide. The ship argues that the beans had been afire or at least charring for two weeks or thereabouts; and there is testimony that they probably had been charring for a time vaguely put at about as long. Obviously it is impossible to know when the charring began; and it makes no difference. We might concede for argument that, although it was not a serious operation to break the hatch into the "Reserve Bunker," it need not have been done at sea; for, even so, enough was already known, at least by the time the ship berthed, to make it a reasonable precaution to do so then. If it had been done, the condition of the stow would have been discovered nearly two days before the fire broke out in it. Even though the bags were smouldering in that interval, some damage was done; and for that much the master's inaction was in any event responsible.

■ We agree therefore with the judge that the master was negligent; and it is also true, as he held, that the owner is not liable for that negligence without more: that is, not unless it was shared by someone higher in authority. Borges's negligence will do, for to him was deputed supervision over the condition of ships as they came in, and of any repairs they might need, and his word was final about such matters as what was necessary to their proper care in port. The fact that Zumsteg was over him does not mean that he was not himself near enough to the top to charge the owner. The test is the same as is the test of "privity, or knowledge" under the Limitation Section (§ 183, Title 46 U.S.C.A.).[2] While it is seldom if ever that one situation exactly matches with another, we have frequently decided that the negligence of persons no nearer the actual governing officials than Borges should be imputed to corporate owners.[3]

■ We charge Borges with all that the master knew, not because the master knew it, but because it was his duty from what the master told him and what he saw, not to accept the master's assumption that all was well, but to push inquiries home, to cross-examine the master, to examine the engine room logs, and in general to bestir himself until he had all the information that anyone on board had. As in all such cases, the measure of the duty imposed depends upon the cost or difficulty of the precaution, compared with the hazard and the interest at stake. Borges was charged with providing for the safety of a cargo worth over half a million dollars; the necessary precautions were no more than to extract from those on board whatever they knew; and not to treat the fire as a matter on which another's judgment might be conclusive. Indeed, he did think the fire important enough to go himself to the scene; and what he saw, coupled with what he should have learned, charged him with immediate action. Like the master, he should have broken the hatches of the "Reserve Bunker" on the 30th. If he did not know what was stowed there, he should have found out; a fire which had flamed intermittently for two days, had never been really quenched, and such a fire, so close to such a cargo, was pregnant with the most serious danger. Again, having taken over the removal of the coal, he should have seen that it was done with speed. The shore gang did not appear till the morning of the 31st. If it was dangerous to the cargo to leave the coal, that danger

[2] Craig v. Continental Insurance Co., 141 U.S. 638, 646, 12 S.Ct. 97, 35 L. Ed. 886; Consumers Import Co. v. Kawasaki Kisen Kabushiki Kaisha, 2 Cir., 133 F.2d 781, 784.

[3] Sanbern v. Wright & Cobb Lighterage Co., D.C., 171 F. 449, 475, affirmed 2 Cir., 179 F. 1021; In re P. Sanford Ross, D.C., 204 F. 248; The Rambler, 2 Cir., 290 F. 791; Arkell & Douglas v. United States, 2 Cir., 13 F.2d 555, 557; In re Pennsylvania R. Co., 2 Cir., 48 F.2d 559, 563; In re New York Dock Co., 2 Cir., 61 F.2d 777; The Doris Kellogg, D.C., 18 F.Supp. 159, 168, affirmed, 2 Cir., 94 F.2d 1015.

was continuing and cumulative. Finally, even if he did in fact clear the bunker as fast as he should, what had happened was apparent by midnight on the 31st, more than seven hours before any fire was discovered in the stow. The condition of the bunker should have made it clear to any careful and competent person that the forward cargo must have been exposed to great heat over a substantial period; and that demanded that he should move at once. The measure in such cases is not what the owner knows, but what he is charged with finding out. He may, if he will, put his ship at hazard and answer as he can to his underwriters, but to the cargo he must not be indifferent; he is relieved of his absolute liability at common-law only upon condition that he exercises care measured by the occasion. For these reasons we cannot agree that Borges was any less slack or careless than the master.

 This runs counter to one of the findings of fact, so named; but a finding of negligence is not a finding of fact which must be "clearly erroneous" to be subject to review.[4] It sets a standard of conduct, which while it is applicable only to the concrete situation, involves a choice between, and an appraisal of, two contrasted values —the needed precaution and the possible damage. It is true that, when the wrong is not deliberate, the occurrence of the loss or damage by hypothesis involves a factor of probability and it may be argued that probability is a question of fact. Even so, after the damage has been discounted by the risk, the decision involves a comparison of the contrasted values: the necessary precautions and the stake; and that in turn demands the setting of a standard, a norm, an imperative, which is the usual hallmark of a jural act. Certainly such a decision is not like a decision of fact uncolored by any element of choice or fiat. We are therefore free to exercise our own judgment upon Borges's conduct and we hold that he was negligent both in failing to take quicker action to examine the cross bunker, in failing to break the hatches in the "Reserve Bunker" on the 30th, and again

in so failing as soon as the condition of the cross bunker became visible, or should have become visible, had proper speed been used. That being true, it is not important whether some of the damage had been done before Borges failed in his duty; any more than whether such preceding damage may have been one of the causes for the fire in the stow. If the owner would free itself from liability for such damage the doctrine of The Vallescura[5] imposes upon it the hard burden of proving how much was not caused by the wrong, a burden whose discharge ordinarily carries such small hope of success that it may not care to make the attempt. Be that as it may, the fire in the "Reserve Bunker" was the cause of all the resulting water damage, and we need not go into the question of the seaworthiness of the "Pocone's" bulkheads.

Decree reversed; cause remanded.

---

[4] Sidney Blumenthal & Co. Inc. v. Atlantic Coast Line R. Co., 2 Cir., 139 F.2d 288, 290.

[5] 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 373.