**Petition of HENRY DU BOIS' SONS CO., Inc., as owner of THE Derrick TRENTON, her tackle, apparel, etc., for exoneration from or limitation of liability.**

United States District Court
S. D. New York.
Dec. 9, 1960.

Purdy, Lamb & Catoggio, New York City, for petitioner. Vincent A. Catoggio, New York City, of counsel.

Tashof & Sobler, New York City, and Paul C. Matthews, New York City, for claimant. John J. Robinson, Edwin M. Bourke, New York City, of counsel.

WEINFELD, District Judge.

Petitioner seeks to limit its liability [1] to $1,500, the value of its derrick, the Trenton, which capsized and sank with its sole crew member, Robert Dunbar.

Dunbar's widow, the claimant herein, as administratrix of his estate, recovered a judgment against petitioner in the sum of $62,000, in an action brought under the Jones Act.[2] Upon appeal, the judgment was affirmed, the Court of Appeals holding that there was substantial evidence to support her claim that the petitioner was negligent in failing to caulk the Trenton's hull properly, with the result that it capsized because of an increased leakage when in tow.[3]

The petitioner, seeking limitation of liability, has the burden of proof to establish that the negligent acts or conduct which occasioned Dunbar's death were without its privity or knowledge.[4]

Since petitioner is a corporation, the issue in large measure revolves about whether the negligence charged was that of an executive officer or supervisory employee who occupied such a position in the managerial hierarchy so as to render his privity or knowledge that of the company.[5]

The Trenton was a steam derrick which had been converted from half of a wooden car float approximately thirty years ago. The age of her hull is unknown. She had been in fairly constant use through the years in dredging operations. She was incapable of self-propulsion and, when a dredging job was finished, was towed by tug to her next assignment. When so towed, a single deck hand was on board.

On June 6, 1955, the Trenton had completed an assignment in the East River. That night she was taken in tow by a tug, bound for her next dredging job in Hempstead Harbor, Long Island, which she was scheduled to reach the following morning at 8 A.M. Dunbar was the only employee aboard. About 1:30 A.M., as the tug was turning to enter Hempstead

1. 46 U.S.C.A. § 183.

2. 46 U.S.C.A. § 688.

3. Dunbar v. Henry Du Bois' Sons Co., 2 Cir., 1960, 275 F.2d 304.

4. See Coryell v. Phipps, 1943, 317 U.S. 406, 409, 63 S.Ct. 291, 87 L.Ed. 363;

The Marguerite, 7 Cir., 1944, 140 F.2d 491, 492.

5. Coryell v. Phipps, 1943, 317 U.S. 406, 410, 63 S.Ct. 291, 87 L.Ed. 363; Craig v. Continental Ins. Co., 1891, 141 U.S. 638, 12 S.Ct. 97, 35 L.Ed. 886; The Marguerite, 7 Cir., 1944, 140 F.2d 491, 493.

Harbor, the Trenton capsized and sank, and Dunbar was drowned.

Dunbar was ordered to ride the vessel from the East River to Hempstead by Joseph Rosolino, a shoreside superintendent of petitioner. The latter was one of the witnesses called by petitioner to sustain its limitation plea. The claimant, to rebut their testimony, relied upon one Lopez, who had worked steadily on the Trenton for about two years up to approximately a month before she went under.

I have fully considered the circumstances of the termination of Lopez's employment with petitioner and the claim of his hostility toward it; nonetheless, I am persuaded that he told a substantially truthful story.

Upon all the evidence, and after observing the demeanor of the witnesses who testified, I find that the petitioner has failed to sustain its burden of proof.

■ The record abundantly establishes that the hull of the Trenton was in poor condition. She had a bad bow which took leaks excessively. This condition existed for at least two years before her sinking. The Trenton was in such poor shape that, to use Lopez's language, she was "babied * * * in order to take the brunt off of the bow * * *." Coal cargo was placed as far back as possible in order to keep the bow up. When in tow, water leaked through open seams which were about a foot and a half to two feet above the water line. This was reported by Lopez to Rosolino. Indeed, Rosolino admitted that the derrick had a few seams that were troublesome. Because water poured into the derrick's open seams, it was customary to tow her stern first, or following another tow. Rosolino himself cautioned Lopez to make sure she was towed in this fashion.

Approximately a year before the derrick went under, she took on so much water that her pumps were inadequate to the task and the vessel was taken to a yard where a hole was chopped in the deck and a ten-inch suction pump put in to pump her properly. An attempt to patch the bow was made, but Lopez advised Rosolino that the job had not been adequately performed and that it was still leaking. In fact, the bow leaked so excessively that frequently Lopez tried to plug the leak from the inside, using cotton or oakum as a temporary measure. Despite his awareness that there was unusual leakage while the vessel was in tow, Rosolino never rode her or went below to examine the bow when the vessel was under tow.

In sum, Rosolino had actual knowledge of the vessel's condition.

■■ The question remains whether Rosolino's position in the corporate structure is such that his privity or knowledge may be imputed to the petitioner.

The teaching of the cases is that "liability may not be limited under the statute where the negligence is that of an executive officer, manager or superintendent whose scope of authority includes supervision over the phase of the business out of which the loss or injury occurred." [6]

Rosolino was petitioner's outside superintendent in charge of the Trenton and saw her every day that she worked. He was under a duty to see that she was in safe shape. He supervised her maintenance, reported repairs which might be required, delegated others to perform necessary work, arranged to obtain work for the Trenton, supervised the performance of the jobs and hired and assigned the complement of personnel to the vessel. Petitioner, as far as the Trenton was concerned, depended on Rosolino. The fact that he reported to superior officers the need for repairs "does not mean that he was not himself near enough to the top to charge the owner." [7] Rosolino's posi-

---

6. Coryell v. Phipps, 1943, 317 U.S. 406, 410, 63 S.Ct. 291, 293, 87 L.Ed. 363.

7. Great Atlantic & Pacific Tea Co. v. Lloyd Brasileiro, 2 Cir., 159 F.2d 661, 664, certiorari denied 1947, 331 U.S. 836, 67 S.Ct. 1519, 91 L.Ed. 1849.

tion as superintendent, and the scope of his authority with respect to the Trenton, render his privity or knowledge that of the petitioner and is binding upon it.[8]

Other factors militate against petitioner's plea. Privity or knowledge, as used in the limitation statute, "means not only personal cognizance but also the means of knowledge—of which the owner or his superintendent is bound to avail himself—of contemplated loss or condition likely to produce or contribute to loss, unless appropriate means are adopted to prevent it." [9]

The derrick was not a seagoing vessel. Its dredging operations were confined to the New York Harbor. Except when actually dredging or in tow, it really never was beyond the immediate control and direction of shoreside executive and managerial employees of petitioner. It was regularly available for inspection by Rosolino, as well as other managerial employees and executives of petitioner.

Petitioner had no system or regulation for regular inspection or drydocking, although it owned and operated about thirty vessels. No routine inspection had ever been made of the Trenton.[10] Thus it closed its eyes to what would have been obvious and readily revealed upon a proper and periodic inspection.[11] The record compels the conclusion that the supervision of the vessel was casual and was performed in an indifferent and perfunctory manner.[12] The corporation is chargeable with knowledge of what its managing officers or supervisory employees might have known, and were bound to know, had they made a proper inspection.[13]

8. See States Steamship Co. v. United States, 9 Cir., 1958, 259 F.2d 458, certiorari denied 1959, 358 U.S. 933, 79 S. Ct. 316, 3 L.Ed.2d 305; The Cleveco, 6 Cir., 1946, 154 F.2d 605; The Marguerite, 7 Cir., 1944, 140 F.2d 491; The Erie Lighter 108, D.C.D.N.J.1918, 250 F. 490; Sanbern v. Wright & Cobb Lighterage Co., D.C.S.D.N.Y.1909, 171 F. 449, affirmed mem. 2 Cir., 1910, 179 F. 1021. Cf. Spencer Kellogg & Sons v. Hicks, 1932, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903; Great Atlantic & Pacific Tea Co. v. Lloyd Brasileiro, 2 Cir., 159 F.2d 661, certiorari denied 1947, 331 U.S. 836, 67 S.Ct. 1519, 91 L.Ed. 1849; In re New York Dock Co., 2 Cir., 1932, 61 F.2d 777.

9. The Cleveco, 6 Cir., 1946, 154 F.2d 605, 613. See States Steamship Co. v. United States, 9 Cir., 1958, 259 F.2d 458, 466, certiorari denied 1959, 358 U.S. 933, 79 S.Ct. 316, 3 L.Ed.2d 305; Great Atlantic & Pacific Tea Co. v. Lloyd Brasileiro, 2 Cir., 159 F.2d 661, 665, certiorari denied 1947, 331 U.S. 836, 67 S.Ct. 1519, 91 L.Ed. 1849; The Mattie, D.C.E.D.N.Y.1941, 38 F.Supp. 745, 748, affirmed per curiam sub nom. Jacobus Grauwiller Co. v. Reichert, 2 Cir., 1943, 136 F.2d 904; Lord v. Goodall, etc., Steamship Co., C.C.D.Cal.1877, 15 Fed.Cas. pages 884, 887, No. 8,506, affirmed 1880, 102 U.S. 541, 26 L.Ed. 224.

10. Petitioner called a witness who testified there was no custom or practice in the New York Harbor for regular inspection of vessels like the Trenton, or which required that they be drydocked after a lapse of a fixed period of years to caulk their bottoms. Such a custom, however, assuming that it existed, does not excuse the exercise of reasonable care. Virginia Elec. & Power Co. v. Carolina Peanut Co., 4 Cir., 1951, 186 F.2d 816, 819–820, 32 A.L.R.2d 234; Vanderlinden v. Lorentzen, 2 Cir., 1944, 139 F.2d 995, 997; The T. J. Hooper, 2 Cir., 60 F.2d 737, 740, certiorari denied Eastern Transp. Co. v. Northern Barge Corp., 1937, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571; Muratore v. United States, D.C.S.D.N.Y. 1951, 100 F.Supp. 276, 282. Cf. Orthopedic Equipment Co. v. Eutsler, 4 Cir., 1960, 276 F.2d 455, 462.

11. Cf. The Friendship II, 5 Cir., 1940, 113 F.2d 105, 107, reversed on other grounds sub nom. Just v. Chambers, 1941, 312 U.S. 383, 61 S.Ct. 687, 85 L. Ed. 903; In re New York Dock Co., 2 Cir., 1932, 61 F.2d 777; In re P. Sanford Ross, Inc., 2 Cir., 1913, 204 F. 248; The Republic, 2 Cir., 1894, 61 F. 109; Sanbern v. Wright & Cobb Lighterage Co., D.C.S.D.N.Y.1909, 171 F. 449, 455, affirmed mem. 2 Cir., 1910, 179 F. 1021.

12. Cf. Sanbern v. Wright & Cobb Lighterage Co., D.C.S.D.N.Y.1909, 171 F. 449, 455, affirmed mem. 2 Cir., 1910, 179 F. 1021.

13. Cf. The Republic, 2 Cir., 1894, 61 F. 109.

On all the facts, limitation is denied and the petition is dismissed.

The foregoing shall constitute the Court's findings of fact and conclusions of law.