## AMENDOLA v. UNITED STATES.

District Court, S. D. New York.
Nov. 17, 1947.

See also 65 F.Supp. 85.

Harry L. Marcus, of Brooklyn, N. Y. (Jacob Rassner and Robert Klonsky, both of New York City, of counsel), for libellant.

John F. X. McGohey, U. S. Atty., and Barns & Cook, all of New York City (P. L. Murphy, of New York City, of counsel), for respondent.

Galli & Locker, of New York City (Patrick J. McCann, of Brooklyn, N. Y., of counsel), for respondent-impleaded.

MEDINA, District Judge.

The SS "Robin Doncaster" arrived at the premises of the respondent-impleaded Sullivan Drydock & Repair Corp. about a month prior to November 6, 1943, the date of the explosion which caused libellant's injuries. She was moored at Sullivan's Drydock at the foot of 23rd Street, Brooklyn, New York, and the work of converting her from a cargo vessel to a troop carrying ship was at once begun. As the SS "Robin Doncaster" was owned by the United States, the work of refitting was performed pursuant to a contract between the United States and Sullivan, the terms of which will be later discussed.

According to custom all ammunition and other explosive materials had been removed before the vessel arrived at Sullivan's premises but, as in other prior instances having to do with other vessels, the hydrogen house and its contents were not disturbed. This hydrogen house was a structure affixed to the main deck, just a few feet aft of No. 5 hatch. It was approximately 15 feet long, running athwartships, 3 feet wide and 7 feet high, constructed of reinforced concrete set on steel frames. The door, which opened to starboard, gave access sufficient only to slide the cylinders of hydrogen into racks provided for the purpose. There were 10 of these cylinders in the hydrogen house at the time and their dimensions were in the neighborhood of 10 feet in length by 10 inches in diameter; and the racks were so arranged that the bottom surface of the lowest cylinders would be about 8 or 10 inches from the main deck, which constituted the floor of the hydrogen house. The deck was of 3/4 inch steel.

This hydrogen house was securely locked with "a good sized brass padlock," and was dogged down as well. The keys were customarily in the custody of the master of the vessel, who, together with the engineer, remained on board during the conversion operation at Sullivan's. It was the testimony of Dominick McDonagh, a master mariner, that it was established custom for the master to remain with his ship during refitting and conversion operations and upon temporary absence to delegate some other officer to take his place; also that it was the duty of the master to see that all repairs were properly attended to and the vessel maintained in a seaworthy condition. There is ample proof that the master made frequent rounds of inspection with Gallagher,

who was Sullivan's general superintendent of all the conversion and repair work on this particular vessel, and that the master was well aware of the fact that welding operations were being conducted in various parts of the vessel and in particular in the vicinity of the hydrogen house. Sullivan's employees, however, had no access to the hydrogen house. While they were aware of its general character, they had no notice of what its contents were. With reference to vessels in general, which were in the yard for repairs, Sullivan's men removed hydrogen bottles and replaced them when specific orders for doing so were given in the regular routine.

It is of some significance that the provisions relating to the removal and replacement of 10 hydrogen bottles (items 243/200 and 250/200) in the specifications (Exhibit G) which were made part of the contract between the United States and Sullivan, were drawn up and inserted after November 6, 1943, and evidently as a consequence of the explosion on that day. In any event, Sullivan's men had been accustomed, both on this and other vessels of the United States, to do their welding in the immediate vicinity of these hydrogen houses without any warning or sense of danger.

On top of the hydrogen house were two vents, for the purpose of voiding any free hydrogen vapor that might for any reason be present. They were of the goose-neck type, crooked down, both facing outboard port and starboard, about 18 inches high and placed 6 or 7 feet apart. The uncontradicted testimony is that both of these vents were clogged by one or more coats of old paint and that they were in this condition when the vessel arrived at the shipyard.

When the F. B. I. investigator arrived after the explosion, he discovered that there was a tiny hole in the safety diaphragm of one of the cylinders, which had evidently been caused by friction with a jagged edge on the collar surrounding the diaphragm. This hole was hardly perceptible to the eye and was too small for measurement without scientific instruments. In this way free hydrogen had evidently leaked out into the hydrogen house, and, with no means of free egress, produced a condition of hidden menace should the free hydrogen be ignited.

The F. B. I. investigator found no scintilla of evidence of sabotage or incendiarism; nor is there any proof that any of the cylinders exploded. One of the most satisfactory witnesses in the case was the chemical engineer Deutsch, who testified that the diaphragm would have had an entirely different appearance than that described by Matthews, the F. B. I. investigator, if the diaphragm had been ruptured from within by expansion of the hydrogen caused by the application of heat to the outside of the cylinder. The possibility that the presence of hydrogen vapor in the structure might have thus been caused is definitely eliminated.

Part of the operation of refitting the vessel was the placing of steel partitions for the officers' toilet immediately under the hydrogen house. The sheets of metal had been tacked in place and the work of welding in this particular spot commenced on November 5th. The partitions met in a T-shaped formation, as shown in the photographs and in the diagram prepared by Matthews, which also indicates the precise position of the T with relation to the hydrogen house immediately above it. On November 5th Hagan, the welder, finished most of the perpendicular line of the T and on the 6th he was working in the corner just to the right of the place where the two lines of the T meet. The work was almost finished without incident, but, due to the poor fit of the metal sheets, which caused a space in the corner wider then the ordinary seam, Hagan had to resort to the process of weaving, which is done when it is necessary to provide the additional molten metal needed to fill the crevice or crack; and the explosion followed.

This procedure just described would result in the generation of a heat of about 6500° Fahrenheit at the place where Hagan was welding and something in the neighborhood of 2000° or slightly less on the other side of the weld, on the floor of the hydrogen house. This would be sufficient to produce a small cherry-red spot on the floor of the house but not enough to affect the metal of the hydrogen cylinders.

While it was the custom to provide fire watchers whose duty it was, in the case of welding, to inspect the other side of the

weld to see if it was safe to proceed with the welding, such an inspection would have been of no avail here. Hydrogen vapor is odorless and any inspection on the morning of November 5, when the welding commenced, would have revealed no more than the rows of hydrogen cylinders all apparently intact and in good condition. The F. B. I. investigation established that there were no debris, loose pieces of wood, paper or waste or anything else on the floor of the hydrogen house but the coating of rust described by Matthews, which would mean nothing.

There is no evidence that at any time prior to the explosion on November 6, 1943, was it common practice to have an inspection of hydrogen houses and the issuance of a chemist's certificate prior to welding in the immediate vicinity. Moreover, as far as this record discloses, there had never been a single prior instance of such an inspection and the issuance of such a chemist's certificate.

■ From all this it is established that the welding could not have affected the cylinders and that there was no substantial danger to be apprehended from welding in the immediate vicinity of the hydrogen house, in the absence of free hydrogen vapor within the house itself. As it was the duty of the vessel and her owners to provide Sullivan's men with a safe place to work, and as neither Sullivan nor Sullivan's employees had any reason to suppose that there was any free hydrogen vapor in the house, it follows that the United States as the owner of the vessel is liable and Sullivan is not. This is true for the additional reason that the owner was under a duty to maintain the vessel in a seaworthy condition and the uncontradicted proof establishes that a vessel with a hydrogen house containing explosive and highly inflammable free hydrogen vapor is not seaworthy.

The work of refitting and conversion was performed by Sullivan pursuant to the terms of a contract, Exhibit F, bearing the symbols No. WSA-5375; DA-WSA-340, which contained the usual provisions for elaborate and complete supervision by the government "Repair Representative" and others.

■ It is claimed that under the circumstances above described Sullivan is liable by reason of the following clause of Article 9 of the contract: "(e) The Contractor shall exercise reasonable care to protect the vessel from fire under the prevailing circumstances. To this end the Contractor shall maintain a reasonable system of inspection over the activities of welders, burners, riveters, painters, plumbers and similar workers, particularly where such activities are undertaken in the vicinity of the vessel's magazines, fuel oil tanks or storerooms containing inflammable materials. Hose lines shall be maintained in such number and as required by the Repair Representative between the vessel and the shore ready for immediate use at all times while the vessel is berthed alongside the Contractor's pier or in dry dock or on marine railway. All tanks under alteration or repair shall be cleaned, washed and steamed out by the Contractor as may be necessary and the Repair Representative shall be furnished with a gas-free certificate before any work is done on a tank. The Contractor shall maintain a fire watch on the vessel at all times which shall be satisfactory to the Repair Representative."

This clause, however, has no reference to the hydrogen house. "Storerooms containing inflammable materials" are such places as paint lockers where fires on shipboard are likely to originate if welding or burning is done near-by.

■ A further question arises in connection with the interpretation to be given to the indemnity clause contained in the said contract with Sullivan. This is also part of Article 9, and its terms follow: "(m) The Contractor shall indemnify and save harmless the Government and its agencies and instrumentalities, the vessel and the owner of the vessel, from all suits or actions and damages or costs of every name and description to which the Government and its agencies and instrumentalities, the vessel or the owner thereof may be subject or put by reason of injury (including death) to the person or property of another arising or growing out of the fault or negligence of the Contractor or any subcontractor, its or their servants, agents or employees."

While the language of this clause differs somewhat from that used in the indemnity provision before the court in American

Stevedores v. Porello, 330 U.S. 446, 67 S.Ct. 847, the problem of interpretation is much the same. It may be that the parties only meant Sullivan to indemnify the United States should the government be held liable for damages solely caused by Sullivan's negligence. It may be that the intention was that Sullivan should fully reimburse the United States for all damages caused in any part by Sullivan's negligence. The parties may have intended some apportionment of the damages in the event of joint negligence. See 330 U.S. at pages 457, 458, 67 S. Ct. 847.

If the above stated conclusions on the merits are sound, the question of interpretation of the indemnity clause is academic. The parties, however, have requested that there be an expression of the views of the court on that subject. As every particle of available proof relevant to the issue of construction was taken and the matter thoroughly argued and briefed, this request will be acceded to for the benefit of any appellate court which may be called upon to review the case. That the clause is ambiguous sufficiently appears on its face; and the ruling in the Porello case makes it quite clear that evidence of the attendant facts and circumstances bearing upon the intention of the parties was properly admitted. See 330 U.S. at page 457, 67 S.Ct. 847.

■ Whether the case is governed by New York law (see Semanchuck v. Fifth Ave. & 37th St. Corp., 290 N.Y. 412, 49 N.E. 2d 507) or by the general principles which remain in what may be termed the reservoir of federal common and admiralty law applicable to maritime and other contracts (see Clearfield Trust Co. v. United States, 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838; D'Oench, Duhme & Co. v. Federal Deposit Insurance Corporation, 315 U.S. 447, 62 S. Ct. 676, 86 L.Ed. 956), the result here must be the same, as the parties intended the language chosen by them to evidence an intention that Sullivan indemnify the United States only in cases of injury (including death) to the person or property of another arising or growing out of the sole fault or negligence of Sullivan or any of Sullivan's subcontractors, servants, agents or employees.

Both the general service agreement, Contract WSA-225, between the United States and Seas Shipping Company, Inc., Exhibit H, and the contract with Sullivan for the repair and alteration of vessels above referred to, disclose a liberality toward contractors thoroughly consistent with the urgent need created by war conditions. The provisions for insurance contained in both agreements manifest an intention on the part of the government to absorb and pay for all expense entailed in the procurement of insurance policies to cover all anticipated risks. The uncontradicted and entirely reasonable testimony establishes that Sullivan and its counsel secured the issuance of policies which were regarded as giving Sullivan complete coverage. The expense of all this insurance was borne by the government. Furthermore, in compliance with various provisions of the contract with Sullivan, its policies were checked and approved in due course. Had it been thought necessary to cause the procurement of an additional policy to cover contractual liability by reason of the indemnity clause, the absence of such a policy would doubtless have been alluded to, but it was not.

That the indemnity clause in question was no more than a statement of what the legal position of the parties would have been in any event is in no sense strange, as the agreement abounds with other clauses which are similarly unnecessary. See for example Articles 14, 17, 18, 19, 20 and 21. In this respect this particular contract is by no means unique. Indeed, it was but natural that the forms prepared, as this one was, by government counsel should, as a mere expedient of prudence, cover many phases of the relationship between the parties by a recital of "existing law." In any event, that is what was done here. While one may regret the inability of the parties to locate and produce as a witness the individual personally responsible for the drafting of the agreement, it seems highly improbable that such testimony would have been at variance with the interpretation indicated by the acts and conduct of the parties at the time. Moreover, the construction now given is the most natural one which the language of the indemnity clause will bear, leaving the attendant facts and circumstances entirely

out of consideration. It was perhaps for this reason that the Supreme Court, in its enumeration of the various possible interpretations to be given to the indemnity clause in the Porello case, placed this particular construction first. See 330 U.S. at page 457, 67 S.Ct. 847.

■ The evidence relative to libellant's injuries is contradictory and confusing, the more so because the medical testimony depends in large measure upon data supplied by libellant whose past record and many exaggerations have made it possible for the court to accept his testimony only when corroborated by extrinsic facts, contemporary hospital records and the testimony of other witnesses who made a more favorable impression upon the court. Libellant went to work at 15 or 16 years of age when he had attained the seventh grade in school. He made frequent changes of occupation, prior to his employment by the respondent Sullivan Drydock & Repair Corp. in 1941, having been employed in a paint factory, as a runner for the Baltimore & Ohio Railroad Company (which led to his difficulties with the law), driving a truck, acting foreman for the WPA, helper in the shop of Bethlehem Steel Corporation, and so on. Prior to the explosion on board the SS "Robin Doncaster" on November 6, 1943, when he received the injuries complained of in this case, he sustained two other injuries. In May 1929 he was given what must have been a hard blow on the head with a policeman's billy, which caused him to remain for 14 days in the Beekman Street Hospital. There are no available hospital records to indicate the severity of this injury or the number of stitches, if any, taken in his scalp. On May 11, 1937, he received an injury to his back and the X-rays taken at the time revealed a transverse fracture involving the fifth lumbar vertebra in the region between the right superior and inferior articulating processes. His recovery from the back injury was evidently complete and it has no bearing upon the amount of libellant's recovery here.

At the time of the explosion in the hydrogen house libellant was working on a staging in the 'tween deck about 40 or 45 feet from the hydrogen house and in a position about 6 or 8 feet forward of the square of the hatch. When he was found, there were wooden horses and planks scattered about and also pieces of cement. The man working near him was killed outright by a piece of flying debris. The visible injuries to libellant were a laceration and contusion of the scalp about two inches long in the forehead just above the hair line and a contusion in the lumbar region of his back. There is nothing to indicate that he was injured by the mere concussion of the explosion. As he was precipitated a distance of from 7 to 8 feet from the staging upon the steel deck, it is probable that the contusion in his back was caused by the fall. The laceration and contusion of the scalp may have been caused by a glancing blow from a piece of flying debris or by the fall.

While he suffered some pain and weakness from the back injury and for about 2 years after the accident wore a sacroiliac belt upon the recommendation of physicians, his recovery from this injury appears to have been complete some time ago, despite his protestations to the contrary.

While the records produced from the Navy, in which libellant served for a few weeks, indicate that an electro-encephalogram, taken some time in June, 1945, showed a reading "within normal limits," the encephalogram taken at the New York Post Graduate Hospital on February 14, 1946 and also one taken by Dr. Strauss during the trial indicate beyond peradventure of doubt an abnormal record over the frontal and parietal cortex, such as might well have been caused by the explosion on November 6, 1943. The precise extent of this damage to libellant's brain and its consequences depend a good deal upon his own testimony of his condition before and after the accident and that of witnesses who observed him at work after the accident.

After a careful perusal of all the medical evidence and the various somewhat voluminous hospital records received in evidence; and, after a consideration of all the various conflicting factors, libellant's damages are assessed in the amount of $17,500.

Submit findings.