## MURATORE v. UNITED STATES et al.

United States District Court
S. D. New York.
Oct. 1, 1951.

Louis Rothbard, Brooklyn, N. Y. (Louis Rothbard, Brooklyn, N. Y. and Ralph Stout, New York City, of counsel), for libellant.

Irving H. Saypol, U. S. Atty. and Burlingham, Veeder, Clark & Hupper, all of New York City (John A. Gleason, New York City, of counsel), for respondent.

Thomas F. Keane, Brooklyn, (Albert S. Commette and H. P. Reid, New York City, of counsel), for impleaded-respondent.

WEINFELD, District Judge.

Libellant, as administratrix of the estate of her late husband, Charles Muratore, sues for damages for his death and also for his conscious pain and suffering following an accident on the SS Samuel Adams, when he fell through an open hatch section of the No. 3 tweendeck to the lower hold.

The respondent, United States of America, was the owner of the vessel, a cargo ship, which was being converted into a troop carrier. It impleaded the Wymo Engineering Corporation, the contractor engaged in the conversion work, as a third party respondent, and in the event of recovery in libellant's favor, seeks judgment against Wymo for the amount of such recovery.

The issues under the pleadings are: (1) Control of the area where the accident occurred; (2) negligence of the respondent; (3) contributory negligence of libellant's decedent; and, in the event libellant is entitled to a decree, then as between the respondent and impleaded-respondent; (4) negligence of the impleaded respondent, and (5) indemnity under the agreement between the respondent and the impleaded-respondent; as well as under the maritime law.

Wymo had been engaged to convert the SS Samuel Adams under a standard Warshiprep contract and commenced work on July 7th, 1945, while the vessel was moored alongside pier 52, Brooklyn, New York.

On the day of, and the day preceding, the accident, Muratore, libellant's decedent, had been employed by Wymo. The accident occurred about 6:00 P.M., Saturday, July 14th, 1945, on the No. 3 tweendeck hatch as Muratore was crossing from the starboard to the port side on the way to his clothes locker.

The square of the hatch was made up of 32 separate hatch covers or units in four rows of eight each, about 4 feet x 2½ feet, with the longer dimension running fore and aft. The forward row was adjacent to an athwartship bulkhead which had been built practically flush with the hatch coaming from deck to ceiling and formed the aft wall of quarters being constructed forward of the No. 3 hatch. Immediately below the center of this forward row was a vertical steel ladder which was the only means of ingress or egress to the

lower hold, and access to the ladder was gained by removal of the center hatch board.

The accident happened about ten minutes before quitting time, after Muratore had finished his day's work, which had been performed from a scaffold on the outside of the vessel. He went inside to the No. 3 tweendeck where he returned a tool to a fellow-employee, MacGregor, who was then at the starboard side near the newly constructed quarters, somewhat fore of the No. 3 hatch. Leaving MacGregor, decedent walked aft at an angle and then across the hatch square toward the port side, along the forward row of hatch covers adjacent to the athwartship bulkhead. He fell through an opening caused by the removal or displacement of the center hatch cover of that row, to the lower hold, a distance of about 30 feet, and sustained serious injuries resulting in his death two days later.

Earlier that day, about 11:00 o'clock in the morning, two men, employees of either the contractor or sub-contractors, had hoisted two or three pails of sand from the lower hold to the No. 3 tweendeck through this opening. This required but 10 minutes and there was no other activity that day in the hold and no reason for the hatch cover to remain out of place thereafter without barrier or protection until 6:00 P.M., seven hours later, when decedent fell.

It was a customary practice at the start of the day's work for the riggers, Wymo's men, to remove the No. 3 main deck hatch covers, which gave natural sunlight on the No. 3 tweendeck hatch area. These were replaced at the end of the day, starting at about 20 minutes before quitting time, and usually one or two sections remained open until the last man was out. When Muratore crossed the hatch most of the main deck covers had been replaced and the area was considerably darkened. The only artificial light came from bulbs on the starboard and port sides, but these gave insufficient light to the area.

There is some testimony as to the existence of a cluster of lights but this was contradictory and conflicting. The court is satisfied that the only cluster of lights was that leading down the ladder from the tweendeck to the lower hold, which cast light into the hold but not on the tweendeck area where the hatch unit was out of place.

Stanchions, guards and other protective devices, accepted and customarily used, were not placed around either the entire hatch or the immediate area of the displaced hatch unit. Thus, the unguarded opening constituted a dangerous and unsafe condition to those having occasion to use or cross the hatch. The danger was increased at the time Muratore crossed, by the darkness resulting from the replacement of practically all the main deck hatch covers.

The basic question is the duty, if any, of the ship owner to decedent and its responsibility for the unsafe condition. This is bound up with the question of control of the area.

██ When a ship owner surrenders control of part of his ship to an independent contractor, his duty with respect to the surrendered part extends only up to the time the independent contractor assumes control. The owner is not responsible for an unsafe condition therafter created by the contractor. Lauro v. United States, 2 Cir., 162 F.2d 32, 34; Lynch v. United States, 2 Cir., 163 F.2d 97, 98; Guerrini v. United States, 2 Cir., 167 F.2d 352, certiorari denied 335 U.S. 843, 69 S.Ct. 65, 93 L.Ed. 393; Grasso v. Lorentzen, 2 Cir., 149 F.2d 127, 129, certiorari denied 326 U.S. 743, 66 S.Ct. 57, 90 L.Ed. 444; Riley v. Agwilines, Inc., 296 N.Y. 402, 73 N.E.2d 718.

However, stating that general proposition does not end, but rather begins, the inquiry. The question here is whether in fact the respondent did surrender control of the ship to the contractor. A study of the record satisfies the court that it did not.

By the terms of the contract, Wymo undertook to place proper safeguards for the prevention of accidents, to keep sufficient lights where necessary during the prosecution of the work, and to use its best efforts to prevent accidents or injury to persons or property.

The contract also contained a clause that "provision shall be made so that personnel

assigned to duty on the vessel undergoing repairs, completion, alterations or additions shall have access to the vessel at all times, it being understood that such personnel will not interfere with the work or the contractor's workmen."

The respondent maintained a crew of officers and men on the ship while she was undergoing the conversion. The court does not regard it of significance that the crew assigned was in compliance with a Coast Guard Regulation. Whether because of voluntary action or in compliance with a Coast Guard Regulation requiring a security watch of its own crew, the fact is that the ship's crew was on 24 hour duty and made regular rounds during the process of conversion. It consisted of a chief mate, night mate, roving guards, roundsman, stationary guards and others engaged in conditioning the life boats and was practically a full deck crew.

The roving guards, working in three eight-hour shifts, generally covered the entire vessel once an hour. So, too, the chief mate and his relief, the night mate, also inspected and toured the ship, but not as often—usually each made the rounds two or three times a day.

The essential purpose of the ship's crew was to protect the vessel against pilferage, sabotage, fire, unauthorized entry, to see that the lines were secure and otherwise enforce rules affecting the safety of the ship.

But the precise nature of their duties with respect to dangerous conditions created by the contractor is in dispute. Specifically as to open and dangerous hatch areas, the respondent urges that by law and custom there was no duty upon the ship owner with respect thereto; the members of the security watch were charged only with the duty of protecting the safety of the ship; that Wymo had and assumed complete and exclusive responsibility for the safety of the men. Bluntly stated, the contention of the respondent is that the sole and only concern of the ship's security guard was to protect the ship and not the contractor's employees—no matter what the danger to the men.

However, from a close study of the record on this subject there emerges the following:

Undoubtedly, the prime purpose of the security watch was the safety of the vessel as distinguished from the safety of the men employed thereon. But the roving guards were required, both by specific orders and general practice, to report to the mate on duty any unsafe and dangerous condition, including open hatch areas, created by the contractor's men. The mate, in turn, had the power to compel correction of the dangerous condition. It is true that he could not do this by direct orders to the contractor's men for they were beyond his immediate direction, but the record is crystal clear that he had the power, and indeed, the duty, to require the foreman or supervisor of the contractor to effect a removal of the existing danger, and in the event of failure to do so, to "knock off" the contractor's men or terminate activities until compliance was secured. The authority to compel removal of a dangerous condition in this manner is recognized in practice and custom.[1]

The power vested in the ship owner to compel the correction of an existing dangerous condition created by the contractor and in the event of the latter's failure to comply, to terminate activity or to exclude the contractor and his men from the job until corrected, establishes control in the ship owner.[2] This is emphasized when we consider that the exercise of such power secures compliance by the owner of the contractor's specifically assumed obligation to use its best efforts to prevent accidents or injury to persons or property on the vessel. While Wymo had charge of various parts of the vessel to carry on the conversion job, it did not have, nor did the ship owner surrender, exclusive and complete control.

Having determined the ship owner was in control or had the power of control, we

1. Testimony of Hill, Port Captain, pp. 429–430, 435–7; testimony of Chief Mate Byers, deposition, questions 222, 226–7; testimony of Adams, S.M. 457.

2. Cullings v. Goetz, 256 N.Y. 287, 176 N.E. 397; Potter v. New York O. & W. Ry. Co., 261 N.Y. 489, 185 N.E. 708.

next consider the nature of his duty to libellant's decedent.

Muratore, as an employee of Wymo, the independent contractor engaged in converting the vessel for the ship owner, the respondent, was a business guest or invitee aboard the ship. Guerrini v. United States, supra; Puleo v. H. E. Moss & Co., 2 Cir., 159 F.2d 842, certiorari denied 331 U.S. 847, 67 S.Ct. 1733, 91 L.Ed. 1857.

This case does not involve any question of seaworthiness, for that doctrine does not extend to contractors' employees working on the vessel. Guerrini v. United States, supra, 167 F.2d at page 354. Nor does it necessarily turn on the duty of the ship owner to provide contractors' employees with a safe place to work, although a number of cases use that expression. This is suggested by Chief Judge Learned Hand in his concurring opinion in Lynch v. United States, supra, 163 F.2d at page 99: "This duty is sometimes put as though it was the same as providing a safe place to work, but, strictly speaking, that is not true. The shipowner is not responsible for giving them a safe place to work; all he need do is to discover any dangers and tell them."

The duty was further considered and defined in the later Guerrini case, supra, by a unanimous Court of Appeals, as follows: " * * * * At times opinions have read as though the duty was limited to pointing out the dangers and not including any affirmative provision for the safety of the 'guest' while on the premises. * * * However, in a suit in the admiralty the distinction becomes important, because if the shipowner owes a positive duty to provide a safe place, regardless of the openness of the danger, the 'guest's' contributory negligence is not a bar, but only goes in mitigation of damages. * * * we hold * * * that the duty is the same as that of employer to employee." 167 F.2d at pages 355, 356.

Thereafter it was reaffirmed in Miller v. The Sultana, 2 Cir., 176 F.2d 203: " * * the measure of care due to [the business guest or invitee] goes beyond merely warning the 'guest' of any dangers, for the duty is the same as that of employer to employee, to use reasonable care to provide for the 'guest's' safety." 176 F.2d at page 207.

Did the respondent breach its duty to use reasonable care to provide for decedent's safety?

The opening in the hatch existed not only from 11:00 o'clock to 6:00 P.M. on the day of the accident, but for some four or five days before July 14th, 1945. That it was known as a fact to the ship owner is overwhelmingly established in this case—indeed, it is not necessary to rely upon constructive knowledge. Sheldrick, one of the roving guards who worked from the 4:00 P.M. to the midnight shift, an unwilling witness, whose duties took him all over the vessel, which he covered every hour, had orders to report an unsafe or out-of-the-way condition to the mate on watch.

The night before the accident the hatch cover was off and at an angle just as it had been for some four days previous and Sheldrick called it to the night mate's attention, who said he would take care of it. This was after the contractors' men had completed their day's work. The next day, the day of the accident, Sheldrick reported as usual at 4:00 P.M. and within a half hour, on his first tour, and again on his second trip shortly before the accident, he saw the hatch cover still at an angle, with an opening large enough for a man to fall through. There were no men working in the hold, or any air, welding or other lines leading thereto, and there was no reason for the hatch cover to be off.

The chief mate, who made rounds from 8:00 A.M. to 5:00 P.M. on the day of the accident, also testified that he saw a hatch cover out of place on the tweendeck, which he recognized as a dangerous condition. Even if we were to disregard the events of the night preceding the accident, the evidence fully establishes that this condition existed for the seven hours following the hoisting of the sand, during which time the roving guard, whose duty it was to report, and the mate, whose duty it was to compel abatement of, the dangerous condition, made their regular rounds and observed the condition. Further, the ship

owner's men knew that when the No. 3 main deck hatch covers were put on at quitting time it would result in lack of sufficient illumination and increase the danger.

True, there are certain inconsistencies in Sheldrick's testimony, who, as stated, was a reluctant witness. The court has critically examined and re-examined his testimony, as well as its trial notes, and believes it has been substantially corroborated by all the other credible evidence in the case.

██ With notice of the dangerous condition, the failure of the ship's officers to require the contractor to barricade the opening or otherwise remove the dangerous condition, or upon its failure to do so, to themselves effect its removal,[3] constituted a breach of the ship owner's duty to use reasonable care for Muratore's safety.

Members of the crew, periodically and regularly patrolling the vessel, could not close their eyes to conditions known to them and known to be dangerous to contractors' employees, business invitees, even assuming custom so decreed. To permit such a custom to prevail where the power to remedy the condition exists in the ship owner, is to sanction a callous disregard of human life—certainly it does not reflect an attitude of reasonable and prudent conduct.

Here a simple direction would not only have assured safety to the men but at the same time would have enforced the contractor's specific undertaking to assure that safety.

██ Even assuming that the respondents had established a custom such as contended for by them, this would not necessarily relieve the ship owner for his breach of duty to invitees. Custom cannot excuse the failure to use ordinary care. The question still remains whether under all the circumstances the owner exercised the care of a reasonably prudent person. A custom may be unreasonable or contrary to what a reasonable man would do under the given facts of the case and, indeed, the Court may disregard it altogether in determining this issue. Vanderlinden v. Lorentzen, 2 Cir., 139 F.2d 995; Virginia Electric & Power Co. v. Carolina Peanut Co., 4 Cir., 186 F.2d 816.

██ The fact that the contractor was under a duty to furnish decedent a safe place to work does not relieve the owner of his responsibility. Nor does the contractor's undertaking in the agreement to prevent accidents or injury to persons exonerate the ship owner from his duty to use reasonable care to provide for the invitee's safety. The contractor and the ship owner each owed a duty to decedent and "neither could devolve his duty to him upon the other, however much they might agree upon its final incidence as between themselves, or whether the law would do so without agreement." Vanderlinden v. Lorentzen, supra, 139 F.2d at page 997; Anderson v. Lorentzen, 2 Cir., 160 F.2d 173, 174–175; LaGuerra v. Brasileiro, 2 Cir., 124 F.2d 553, certiorari denied 315 U.S. 824, 62 S.Ct. 918, 86 L.Ed. 1220; Porello v. United States, 2 Cir., 153 F.2d 605; Fodera v. Booth American Shipping Corporation, 2 Cir., 159 F.2d 795.

Having found the ship owner breached its duty to decedent, the damages must be assessed.

The decedent was 42 years at the time of his death and in apparent good health, a steady worker and of good habits. He was married to libellant in 1927—there were no children of the marriage. He was engaged as a snapper-welder and also as a ship's fitter and was regarded as a good worker. His earnings for the last year and a half of his life averaged between $100 and $125 per week, of which amount he turned over $80 to libellant. His life expectancy was approximately 26 years. His wife at the time of his death was 52 years and her life expectancy was approximately 19 years.

Considering decedent's education, training and his physical condition, it is unlikely there would have been any material im-

---

3. The port captain of ship owner's general agent, in charge of the SS Samuel Adams and eight other vessels, testified that if the contractor's supervisor failed to comply with his direction to rectify a condition he considered dangerous to men working nearby, he would himself put the hatch cover in place or put a chain through the stanchions. (S.M. 436–7).

provement in the nature of his work or his earning capacity. In the court's view, the earnings in the period preceding his death reflect a maximum earning capacity accounted for in some measure by the war situation and the overtime necessitated by the Government's ship building program. Except for normal wage increases in his regular vocation, a decrease, rather than an increase, is indicated in his future earning power.

■ The pecuniary damage may reasonably be assumed at a somewhat lower amount than the $80 a week which the widow received during the period of intense activity, and in the court's view $70 a week, or a total of $3,640 per annum, more realistically reflects the amount of pecuniary damage.

There must, accordingly, be determined the present value of this amount based upon the joint lives of the widow and the decedent. Briscoe v. United States, 2 Cir., 65 F.2d 404. Under present conditions, three to four per cent may be considered a fair rate of return without requiring more than average skill in investing. According to the Federal Security Agency Tables [4] the present value of an annuity of $1.00, based on joint lives of 52 and 42 years, at 3% is $13.0177, which, multiplied by the annual contribution of $3,640, amounts to $47,384; at 4% it is $11.8249, or a total of $43,042. According to the Wolfe Tables [5] the present value at 3½% is $11.1487, a total of $40,581, and at 4% it is $10.6699, a total of $38,838.

Using the foregoing calculations, the present value of the sums which the widow might have expected to receive from the decedent in the future ranges between approximately $39,000 and $47,000. The court finds the pecuniary damage to be the sum of $42,500, plus the funeral expenses of $955, making a total of $43,455.

■ There is a separate cause of action for conscious pain and suffering. After decedent fell he was removed in a semi-conscious condition to a hospital, where he remained in much pain and suffering. He was conscious part of the time until he passed away. The hospital record received in evidence shows cerebral concussion, a crushed chest, fracture of ribs and other injuries of an extremely painful nature. It is evident that he suffered much during his conscious periods in the two days from the time of the accident to his death. The Court assesses the sum of $1,500.

Thus, the total damages amount to $44,955.

We next consider the question of contributory negligence.

Muratore could not walk directly across to the port side from the point at which he delivered the tool to MacGregor on the starboard because of a solid steel partition in the newly constructed quarters. While it is recognized that Muratore had to walk across the square of the hatch to reach the clothes locker, it is urged that he could easily have walked around and avoided the open hatch section—that all other hatch units were in place.

On July 13th and July 14th, 1945, he worked for Wymo as a ship's fitter—on the latter day on the outside of the vessel. There is no satisfactory proof as to where he was stationed or where his activities took him on the 13th. On the 9th, 10th and 11th he worked as a welder and his duties took him to the general area of the No. 3 tweendeck, where the cover was displaced, and on those days he either knew or should have known of its danger. But there is no proof that he had been in the vicinity of the tweendeck on the day of the accident from 11:00 o'clock to 6:00 P.M., when he crossed the hatch; nor is there satisfactory proof that he was there the day preceding. Rec-

4. United States Life Tables and Actuarial Tables, Federal Security Agency, United States Public Health Service and National Office of Vital Statistics, Government Printing Office, 1947. No information is furnished as to 3½%.

5. Wolfe, Inheritance Tax Calculations, 2nd Edition, 1937, Tables IX and XV, pp. 100, 112. No information is furnished as to 3%.

The difference between the two tables appears to be due to the experience upon which the tables are predicated.

ords purporting to show where Muratore worked did not prove altogether accurate.

The route he took in the darkened area was the shortest, the most immediate and natural to reach his clothes locker, and this brought him across the hatch square in line with the missing unit—it was a course "which the shipowner might have supposed an employee would take". Lynch v. United States, supra, 163 F.2d at page 99.

Acknowledging that he had known or should have known of the displaced hatch unit earlier in the week when he worked as a welder, Muratore was not required to assume that the condition still persisted several days thereafter.

Upon all the facts, the court finds no fault or act of the decedent caused or contributed to his injury and death. The respondent has failed to sustain its defense of contributory negligence.

There remains for final consideration the question whether the United States of America is entitled to indemnification from Wymo.

As already set forth herein, the record abundantly establishes that the hatch cover was displaced not only on the day of the accident but also for some four or five days prior thereto. Wymo had knowledge, both actual and constructive, of this and that it constituted a dangerous condition. In creating it and permitting its continuance, in failing to use the stanchions which were available and other recognized and accepted protective devices and in failing to provide proper and sufficient illumination, it was clearly negligent and violated not only its duty to the decedent but also its obligation to the respondent.

While Wymo, just as the respondent, urges that the removal of the center hatch unit leading to the hold was not negligent conduct and was necessary to permit the fire watch and others to work in the lower hold, on the tweendeck area, and for lines leading into the hold, nonetheless, even at all other times, particularly the day of the accident, when, except for the hoisting of the pails of sand, there was no activity or reason therefor, the cover still remained out of place.

The contract between the impleaded-respondent and the respondent contains an indemnity clause which provides:

"Article 9.

\* \* \* \* \* \*

"(m) The Contractor shall indemnify and save harmless the Government \* \* \*, the vessel and the owner \* \* \*, from all suits or actions and damages or costs of every name and description to which the Government \* \* \*, the vessel or the owner \* \* \* may be subject or put by reason of injury (including death) to the person or property of another arising or growing out of the fault or negligence of the Contractor or any sub-contractor, its or their servants, agents or employees."

This clause, although not identical to that considered in American Stevedores v. Porello, 330 U.S. 446, 67 S.Ct. 847, 91 L.Ed. 1011, is substantially the same. As the Supreme Court stated, it is subject to three possible constructions: (1) That indemnity arises only when the United States is held liable for damages solely caused by Wymo's negligence; (2) that the United States should be reimbursed for all damages caused in any part by Wymo's negligence; and (3) that Wymo should be liable for its proportionate share of the damages in case of joint negligence by the Government and Wymo.

Finding that the clause was ambiguous, and noting that no evidence had been taken as to the intention of the parties, the Supreme Court remanded the case to the District Court for a determination of the meaning of the contract.

Upon the remand, again no evidence was offered as to their intention, and the District Court in Porello v. United States, 94 F.Supp. 952, 953, adhering to the construction which had been placed upon the clause by the Court of Appeals in Porello v. United States, 2 Cir., 153 F.2d 605, prior to the appeal to the Supreme Court, held that the owner was entitled to full indemnity although both it and the stevedore had been negligent.

Here, as in the Porello case, the parties have failed to introduce evidence concerning intent, and the court is faced with the

same problem of construction as was the District Court in Porello.

Wymo was under a duty to exercise reasonable care to furnish the employees with a safe place to work. In the first instance it created the condition which ultimately led to decedent's death. The respondent's liability to libellant stems from this original act of the contractor. The impleaded-respondent's negligent conduct, separate and apart from its breach of duty to its employee, Muratore, was also a breach of its contractual obligation, voluntarily assumed, to respondent to provide proper safeguards for the prevention of accidents.

A fair interpretation of the indemnity clause, in the absence of evidence to the contrary, is that it was intended to protect the Government against just such a situation. The court believes that the very purpose of the indemnity provision is achieved by such an interpretation. The view of the Court of Appeals in Porello v. United States, supra, 153 F.2d at page 608, seems particularly appropriate: "The primary duty to furnish its employees a safe place to work rested on the stevedore. * * * Although the stevedore's default in that respect might not relieve the shipowner from liability to the injured workman, it would make it reasonable for the shipowner to insist that the stevedore alone bear the loss, and the quoted provision was inserted in the contract for that purpose."

Although Amendola v. United States, D.C., 74 F.Supp. 488 involved the same indemnity clause now before this court, it does not require a different conclusion. In that case, the court received evidence of the facts and circumstances surrounding the making of the contract and construed the clause as only covering damage caused by the contractor's sole negligence. In the instant case, no such evidence was offered.

Wymo Engineering Corporation, the impleaded-respondent, by virtue of the agreement with the respondent, United States of America, is liable to respondent for full indemnity. Since indemnity arises under the contract, there is no occasion to pass upon the respondent's alternative claim for indemnity based upon the maritime law.

A decree may be entered in favor of libellant and against the respondent and in favor of the respondent against the impleaded-respondent in accordance with the foregoing.

Findings of Fact and Conclusions of Law are filed herewith.