**LAFFOON v. UNITED STATES et al.**

United States District Court
S. D. New York.

Dec. 21, 1951.

Nathan Baker, New York City, proctor for libelant.

Myles J. Lane, U. S. Atty., and Gay & Behrens, New York City, proctors for respondent. Edward J. Behrens, New York City, of counsel.

Purdy, Lamb & Catoggio, New York City, proctors for respondents-impleaded. Vincent A. Catoggio, New York City, of counsel.

IRVING R. KAUFMAN, District Judge.

Libelant brings this action to recover damages for personal injuries sustained while working as a rigger aboard respondent's ship. Respondent seeks indemnity from the trustees of Sancor Corporation, which corporation was libelant's employer. (Sancor Corporation will hereinafter be referred to as Sancor.)

Libelant alleges respondent's breach of duty to maintain a seaworthy vessel and, in the alternative, respondent's negligent maintenance of equipment aboard the vessel.

The facts substantially appear to be these: On January 2, 1946, Sancor contracted with respondent to handle the work of overhauling the ship. An express provision for indemnity in the event of personal injury resulting from Sancor's negligence was part of that agreement. On January 31, 1947, the S. S. Robert W. Hart was taken from a lay-up fleet at Wilmington, North Carolina where she had been retired since December 13, 1946, and sailed to Staten Island, New York. She arrived at Staten Island on February 7, 1947, and while there was inspected by the Waterman Steamship Corporation, general agent for the ship and her bareboat charterer as of March 22, 1947. A representative of the United States Maritime Commission, with the assistance of a representative of Waterman, drew up specifications for repairing her and reconverting her from a cattle boat to a general cargo vessel. The written specifications were delivered by respondent to, and accepted by, Sancor on February 11, 1947.

The specifications included, among others, the following:

"54 *Winches*  Free up and prove in good order the clutches, brakes and control valve levers and linkages."

"38 *Intent*  It is the intent of this specification to describe the work required to restore the vessel to her original condition before having been converted as an animal carrier, all in accordance with the general requirements of the U. S. Coast Guard and the American Bureau of Shipping.

"Contractor to furnish all necessary labor, material and/or equipment required to complete all items of work, unless otherwise specifically directed."

Within the scope of its work as set out by the contract and specifications, Sancor had to remove and replace hatch covers on the number two 'tweendeck hatch. (Specifications, Item 27).

On the morning of March 12, 1947, libelant was injured. He was working as an employee of Sancor at the number two hatch of the ship's 'tweendeck, helping to replace and secure pontoon hatch covers on an open hatch. These were among his duties as a rigger for Sancor. All the work, including the rigging, was being performed by Sancor under the terms of the aforementioned contract and specifications.

It appears that the pontoon covers were made of metal and were each approximately four feet wide, twenty-one feet long and weighed between one-half and one ton. The pontoons were laid athwartships from the center of the open hatch out toward its ends thus placing them so as to omit the first one forward and the last one aft. The procedure that was followed in lowering the pontoon on the hatch was this: A whipwire extended from a winch located near the maindeck hatch. It was coiled around the winch drum and ran up a boom rigged over the maindeck hatch so that the whipwire dropped through the open hatch on the maindeck toward the pontoon cover on the hatch belowdecks. In placing the pontoon over the hatch, a four-cabled bridle was made fast to padeyes at each corner of the pontoon and then joined to the whipwire at the point where the bridle wires converged from the corners of the pontoon. The pontoon was then lowered over the open hatch.

When lowered it did not land exactly flush with the hatch coaming, and to align the cover, the two after bridle wires were uncoupled from the pontoon and the whipwire was run through a shackle on the forward part of the coaming of the maindeck number two hatch to draw the pontoon flush with the coaming. The shackle was approximately twenty feet above the 'tweendeck, and the forward part of the pontoon was approximately four feet three inches aft of the hatch coaming in the 'tweendeck. Thus the whipwire traced an angle running forward from the top of the boom, through the shackle, and back down to the bridle. The winch was supposed to tighten up on the whipwire, causing the pontoon to drag slowly across the hatchway. Libelant kneeled upon the pontoon holding an iron bar braced on his knee for leverage, and as the pontoon dragged, libelant was to lock it into its flush position with the aid of the bar he held.

During this time the winchman was at his winch on the maindeck, and he could not see

libelant on the 'tweendeck below. Standing directly above libelant at the opening of the hatch on the maindeck was the "high-baller", who relayed signals from libelant to the winchman. Libelant testified that he signalled the highballer to move the pontoon a few inches, which he indicated to the highballer by extending the thumb and forefinger of one of his hands. When the winchman received the signal, he put the winch into operation, and there was a resulting violent jerk on the pontoon below. The convulsive motion of the pontoon threw libelant from his kneeling position, and he was hurled backwards across the cover and into the hold fifty feet below. As a result of the fall, libelant sustained injuries to his feet, head and right shoulder, He was left with a permanent limp in both feet and some permanent injury to his right shoulder.

At the outset I am constrained to rule that respondent is not liable to libelant for breach of warranty of seaworthiness. The Court of Appeals for this Circuit has repeatedly held that a shipowner owes no duty of seaworthiness to employees of an independent contractor. Guerrini v. United States of America, 2 Cir., 1948, 167 F.2d 352; Martini v. United States, 2 Cir., 192 F.2d 649; Rich v. United States, 2 Cir., 192 F.2d 858.

There remains the charge of negligence. In this case several possible combinations of negligence exist.

If respondent were found negligent, libelant would recover subject to mitigation of damages for his own contributory negligence. There could be no claim for indemnity against Sancor unless it too were found negligent, and the contract granted indemnity.

If respondent were found not negligent, libelant could have no recovery against it, regardless of any negligence on the part of Sancor, the indemnity claim would be moot, and libelant's only possible claim would be for workmen's compensation against Sancor under the Longshoremen and Harbor Workers' Act, 33 U.S.C.A. § 901 et seq.

If respondent and Sancor were concurrently negligent, issues of proximate cause and construction of the indemnity contract arise. I am convinced, however, that libelant has failed to establish by a fair preponderance of the evidence that respondent's negligence was the proximate cause of the injury. This conclusion, without more, bars libelant's recovery. I base this determination on the following: In substance, libelant alleges that respondent was negligent in the maintenance of winches aboard ship, and that this negligence was the proximate cause of his injury. Libelant alleges that the specific defects in the winch were leaks in the winch valves, creeping of the drum and defective brakes. I do not find that any of these allegations have been substantiated by a fair preponderance of the evidence adduced at trial.

There was some evidence to the effect that the winch drum creeped in neutral, and that it jumped when libelant gave the signal to move the pontoon cover, but I find this evidence less than convincing. It would appear that the convulsive movement of the pontoon more likely was caused by negligent rigging techniques used by Sancor. The laying of the pontoon covers with the fore and aft ends of the hatch open, the upward angle at which the pulling force was exerted on the pontoon cover by the faulty rigging technique of using a shackle instead of a snatch box, and libelant's own foolhardy conduct in kneeling on the cover were, in all likehood, the proximate cause of the sudden movement of the pontoon and libelant's subsequent injuries.

It is urged upon the Court that respondent owed the employees of Sancor, an independent contractor, a duty to use reasonable care to provide for their safety. There is merit to this contention. Miller v. The Sultana, 2 Cir., 1949, 176 F.2d 203. But this general proposition is subject to the limitation that once the owner has relinquished control it is not responsible for an unsafe condition of which an independent contractor has been notified and which it is that independent contractor's duty to repair. Byars v. Moore-McCormack Lines, Inc., 2 Cir., 1946, 155 F.2d 587. It is further subject to the limitation that once the owner has relinquished control it is not responsible for an unsafe condition thereafter

826

created by an independent contractor. Guerrini v. United States of America, supra; Muratore v. United States of America, D.C.S.D.N.Y., 1951, 100 F.Supp. 276.

Therefore, even if it had been proven that the winch was defective, it nonetheless appears that Sancor and not respondent would be liable under the facts in the instant case. The evidence points to control of the winch by Sancor at the time the accident occurred. Libelant has, in addition, failed to prove by a fair preponderance of the evidence that the winch used in moving the pontoon was in fact defective or incapable of performing the task it was designed to perform.

Accordingly, I am of the opinion that the libel and the impleading petition should be dismissed.